## Hilliker et al. v. Thorndale.

June 25, 1943.

Allen, Duncan, Duncan & Arnold for appellants.

George R. Smith for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Affirming.

Miss Olivia E. Israel died intestate December 13, 1940, seized of a valuable farm known as "Thorndale" located near Lexington on the Richmond road. Appellee, St. John Thorndale, claims to be her illegitimate son and as such her sole heir at law. It is agreed that appellants, Addie E. M. Hilliker and Frank Raum Macguire, are the next of kin and entitled to the inheritance unless appellee establishes his claim. Shortly after Miss Israel's

death, Thorndale moved onto the property and instituted a petition in equity against Henry T. Duncan, Jr., the administrator of Miss Israel's estate, and the unknown heirs to quiet his title to Thorndale. After diligent search, appellants were discovered to be the sole remaining heirs; whereupon they answered the suit, gained permission of the court to appear as defendants, and filed counterclaim asking that the plaintiff be ejected from the property and that they be declared to be the sole owners. Both parties moved the court to transfer the case to the common law docket and the case was submitted to the jury on the sole question of whether the plaintiff was the son of the decedent. At the commencement of the trial both parties asked to be adjudged the burden of proof. The court sustained the plaintiff's motion and complaint is now made that this was error; the contention being: that since the case was transferred to the common law docket, it necessarily was tried on the counterclaim; and, since the burden was on the defendants to establish the allegations of the counterclaim, they were entitled to the closing argument. We do not agree with this contention. The case resolved itself into a determination of one question only, that being: Is the plaintiff the son of Miss Israel? The affirmative of that question had to be established, else the defendants would have been successful in the action, and the burden to establish the affirmative was upon the plaintiff. The sole instruction offered and given was:

"If the jury believes from the evidence in this case that the plaintiff St. John Thorndale, is the son of Olivia E. Israel, they will find for the plaintiff, but unless they so believe, they will find for the defendants, Frank Raum Macguire, and Addie E. M. Hilliker."

The superiority of paper or possessory title was not an issue in the case.

Section 526 of the Civil Code of Practice provides:

"The burden of proof in the whole action lies on the party who would be defeated if no evidence were given on either side."

Section 317, subsections 3 and 6, provide that the party on whom rests the burden of proof in the whole action must first produce his evidence and shall be entitled to make the concluding argument. The pleadings

show appellants to be entitled to the inheritance if appellee failed to prove that he was the son of Miss Israel. That being true, the court properly adjudged the plaintiff to have the burden and to be entitled to the concluding argument.

Miss Israel was the daughter of Mrs. Annie E. Israel and the stepdaughter of Captain E. L. Israel, formerly of New Orleans, Louisiana. They moved to Kentucky in 1888 and shortly thereafter Captain Israel purchased the land in question. They were highly refined people and "moved in the best circles," both in Louisiana and Kentucky. On May 10, 1893, a baby, who was later christened St. John Thorndale and is the appellee, was found inside the entrance gate to the Israel farm. The newspaper article reporting the discovery recited that the child was found by Tom Stevens; however, Josh Baker appeared as a witness in the case and testified that he and his brother discovered the child. He stated that they were returning from town, and, when driving past the gate of the Israel farm, they saw the child in a basket; that Miss Olivia Israel was standing about 40 yards away, and, as they got out of their carriage, she likewise started toward the baby, arriving at about the time they did; that they picked up the child and Miss Israel asked them to let her have him, which they did. The witness testified that he was working for a man by the name of John Stevens at the time he discovered the child. Miss Israel and her mother took the child into their home and gave him every advantage they would have accorded a son, until he was almost 16 years of age. Shortly before he was 16 years old, he developed a propensity for stealing, confining his activities in that respect, so far as the record shows, to pilfering things from the house and disposing of them in town. He was apprehended committing such acts and was arraigned before the Juvenile Court in Lexington. The county attorney was Colonel John R. Allen, formerly the senior member of the law firm representing appellants in this action. Colonel Allen had been legal advisor to the Israels for many years and continued in that capacity until his death. Miss Israel appeared as a witness for the prosecution at the trial. Thorndale was found guilty and sentenced to the reform school. He remained there several months and was paroled to Miss Israel. On violation of the parole he was reconfined, later escaped, was rearrested and served the remainder of the sentence.

He was released from the reform school in the year 1912 and went to Ravenna, Kentucky, where he testified he obtained a job with the Louisville & Nashville Railroad Co. Almost immediately after going to Ravenna he was arrested and sentenced from 1 to 5 years in the penitentiary for house breaking and larceny. His companion in the crime was a boy under 16 years of age who was sent to the reform school. After he was released from the penitentiary he joined the army, where he remained until his discharge July 30, 1919. On October 25, 1918, he was married in the state of Indiana. His wife died in the year 1926. He then moved to Portsmouth, Ohio, where he worked in the steel mills. While there he was convicted of stealing an automobile and sentenced to the Ohio penitentiary under the alias of James Cramer. The sentence was from 1 to 20 years, but it appears that he served less than 2 years of the time. Despite his criminal proclivities, Miss Israel remained very friendly with him, as is shown by a letter he received from her addressed to him at Louisville and dated December 17, 1930, and as further evidence by her gift to him of $5 shortly before his second marriage in November, 1931. After his second marriage he engaged as a taxicab driver in the city of Louisville. The record fails to disclose his occupation, if he had any, at the time of Miss Israel's death. He attended the funeral, immediately after which, in the presence of his attorney of record, he suggested to the administrator of the estate that he thought he was the adopted son of Miss Israel and asked the attorney to investigate the records in an endeavor to prove this relationship. Mr. Duncan, Thorndale, and his attorney, Mr. Smith, searched without success for some record of adoption. In the conversation with the attorneys concerning the possibility of his having been adopted by Miss Israel he made no claim that he was the offspring of Miss Israel.

The verdict is attacked chiefly upon the ground that it is contrary to the overwhelming weight of the evidence; the main argument being, that a person of such refinement as appellants proved Miss Israel to be would not likely be the mother of an illegitimate son with such a passion for crime. But we are of the opinion that there is an abundance of evidence to support the verdict. Without unnecessarily detailing the evidence 18 witnesses positively stated that Miss Israel told them she was a mother. 11 of these witnesses testified that

she told them she was the mother of St. John Thorndale, and 2 witnesses testified that Miss Israel's mother told them that her daughter had a son. Twelve witnesses testified as to the striking resemblance Thorndale bore to Miss Israel, mentioning the features of resemblance. One witness testified that they were "as much alike as black eyed peas." Photographs of Miss Israel's mother and Thorndale appear in the record and some of their features are strikingly similar. The evidence in respect to Miss Israel's treatment of Thorndale during childhood and until he developed criminal tendencies shows as much devotion as any mother would display toward her own child, and, in chastizing the overseer of her farm for whipping the boy, several witnesses testified that she exclaimed that the boy was her own flesh and blood. According to the great weight of authority, declarations of a deceased mother are admissible to establish the parentage of her child. Benham v. Kentucky Central Life & Accident Ins. Co., 240 Ky. 169, 38 S. W. (2d) 954; Prudential Ins. Co. of America v. Pierce's Adm'x, 270 Ky. 216, 109 S. W. (2d) 616; 20 Am. Jur. Section 471, page 413; and evidence of resemblance to the parent has been approved as competent to show relationship in many jurisdictions, especially when the child has arrived at an age when resemblance can be determined rather than imagined. 95 A. L. R. Annotations, 315, 316. On the other hand, appellants introduced many witnesses, some of whom had known Miss Israel from early girlhood, and all of whom testified as to her unusually lovely character, fine education, social charm, that she associated with the very best people both in Louisiana and Kentucky, was a devoted member of her church, a person of great refinement, and that her reputation was of the very best. Several witnesses were introduced by appellants showing that before the child was found and at the time he must have been born there was no change in the physical appearance of Miss Israel, and, since that was the day of "lacing" corsets, she could not possibly have borne a child without her neighbors and friends being aware of her condition. Thus it will be seen, the evidence is conflicting. Two of appellee's witnesses were impeached but there is nothing in the record to show that the other 16 were not persons whose reputations were equal to those of the witnesses for appellants. Nearly all of the witnesses were residents of Fayette county and no doubt would have been impeached if tes-

timony to that effect had been available. It is clear, therefore, that the contention that the verdict is contrary to the overwhelming weight of the evidence cannot be sustained.

There remains for our consideration the contention that the court erred in admitting incompetent evidence in behalf of appellee and failing to permit the introduction of competent evidence offered by appellants. The court refused to permit the introduction of a statement made by appellee in a deposition taken before the trial that he "done 3 years and 10 months" in the reform school. The fact that he had been convicted and sentenced to the reform school was clearly established and the number of years and months that he spent therein had no bearing upon the issue. Appellee testified that he was inducted into the United States Army in May, 1917. The court refused to permit appellants to show by the deposition of the warden of the reformatory that at the time appellee claims he was inducted into the army he was confined in that institution. We do not see that appellants' rights were prejudiced by this action of the court, because it was clearly established that he was convicted of a felony and confined in the state reformatory and it was additionally shown from the records of the war department that he was inducted on May 14, 1918, and discharged July 30, 1919. Objection is made to the court permitting appellee to testify as to his feeling toward Miss Israel during the early years of his life upon the ground that he failed to show what his feeling toward her was in later years, but we see no error in that respect and if the evidence could be deemed to be incompetent, we think it was perfectly harmless. Testimony concerning Miss Israel's declaration to him that he would be taken care of upon her death, while incompetent, could not have had any substantial weight with the jury as proof of recognition by Miss Israel that Thorndale was her son. Certainly she did not "take care of him" before her death. When asked who was the prosecuting witness in the trial in the Juvenile Court, the court sustained an objection to the question. Complaint is now made that this was error; but, in further cross examination, the witness testified to the fact that Miss Israel was his accuser and that she had testified against him. Thus the answer was given almost immediately after the objection was sustained. It is claimed that the evidence of appellee's criminal record

should have been admitted as substantive evidence without the admonition that it might be considered only for impeachment purposes, upon the ground that such evidence shows dissimilarity of character between appellee and Miss Israel. No authority is cited for this contention and we are of the opinion that such evidence would have no weight whatever in the allowance of the jury. Society would have no trouble in exterminating crime if only criminals could beget criminals. Appellants offered to introduce testimony concerning the general reputation of Miss Israel since 1913. It was not error to reject this testimony because her reputation 20 years after it is claimed that she gave birth to an illegitimate son would have no probative value as to the verity of that allegation. Hoskins v. Commonwealth, 188 Ky. 80, 221 S.W. 230. The proffered testimony of the witness Featherstone as to what Tom Stevens had told him about finding the child and the fact that Tom Stevens had found the child was common and general knowledge in the neighborhood was not competent because it is strictly hearsay testimony. The rejected testimony of Miss Smiley concerning her conversation with the overseer of Miss Israel's farm was not competent for the same reason. The court should have permitted the introduction as substantive evidence the War Department's questionnaire in which Thorndale stated that Mrs. O. E. Israel was his foster sister, the certified copy of his first application for marriage license in which he stated that his mother's maiden name was Annie M. Williams and his father's name J. C. Thorndale and both parties were dead, and his second application for a marriage license in which he stated that his mother's maiden name was Annie Cramer and his father's name was James Thorndale. These records were proof of declarations made by appellee against his interest and clearly were competent as substantive evidence; however, we believe the admonition of the court that they could be used only for the purpose of affecting the credibility of the witness was not prejudicial to appellants' substantial rights. It is inconceivable that, in the mass of evidence introduced during the five days consumed in the trial of the case, this admonition and slight error could carry weight sufficient to influence the jury in appellee's behalf. We find no error prejudicial to appellants' substantial rights.

The judgment is affirmed.